TITUS et al. v. UNITED STATES SMELTING, REFINING & MINING EXPLORATION CO. et al.

(District Court, S. D. New York. January 24, 1916.)

1. CORPORATIONS ☞574—REORGANIZATION—CONTRACTS BY BONDHOLDERS' COMMITTEE—VALIDITY.

A majority of the bondholders of a corporation whose assets consisted of the capital stock of certain mining companies deposited their bonds with a committee to be used in carrying out any reorganization plan they might approve. The committee entered into a contract with defendant corporation by which the latter agreed to advance money for reorganization purposes and also to expend not exceeding $200,000, in exploration of the mining property. It was to be the sole judge of the manner and extent of such exploration with the right to abandon the work at any time in its discretion, and was to be secured by a pledge of all the property of the first corporation which the committee agreed to buy in at foreclosure sale. Without notifying the bondholders of this contract, the committee submitted to them a plan of reorganization, which was approved, by which the committee was to organize a new corporation to own the property bought in, but which authorized the committee to create prior liens not to exceed $300,000, for any purpose which the committee in its "uncontrolled discretion" should deem wise or necessary for the protection or development of the property. The agreement with defendant was carried out, and to secure it the committee pledged all the property it purchased at the foreclosure sale. Defendant abandoned the exploration work and sold and bought in the stocks so pledged. *Held*, that such contract and the pledge and sale of the stocks thereunder were void because the committee had no authority originally to make the contract, and under the approved plan and agreement its authority to create indebtedness extended only to such as in its "uncontrolled discretion" was necessary for the protection or development of the property, whereas by the contract it had deprived itself of all discretion as to the amount to be expended or the manner of its use; that the pledge was valid only to the extent that it secured advances made for purposes of the reorganization which was within the committee's authority.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2297–2303; Dec. Dig. ☞574.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CORPORATIONS &=574—REORGANIZATION—"PRIOR LIENS."

The words "prior lien," as used in a proposed plan for reorganization of a corporation providing that the property of the old company should vest in a new one free and clear except for a prior lien to be created by the committee, mean a first or superior lien, and not one necessarily antecedent in time.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2297–2303; Dec. Dig. &=574.]

In Equity. Suit by Edward H. Titus and others, as executors, etc., and others, against the United States Smelting, Refining & Mining Exploration Company and others. Decree for complainants.

Otto C. Wierum, Jr., of New York City, for complainants Titus and others.

Fredric W. Frost, of New York City, for complainants Deckand and others.

Thomas Mills Day, of New York City, for complainants Denison and others.

Wing & Russell, of New York City. (Philip W. Russell and Burt D. Whedon, both of New York City, of counsel), for defendants.

MAYER, District Judge. [1] This suit is brought by various bondholders of the Alaska-Ebner Gold Mines Company (hereinafter called "Alaska-Ebner"), on behalf of themselves and all other certificate holders under a deposit agreement and reorganization plan of bondholders of Alaska-Ebner dated September 11, 1913, who shall make themselves parties to the suit and contribute to its expenses. The relief asked for, briefly stated, is: (1) That a certain agreement dated June 30, 1913, and a supplemental agreement dated December 30, 1913, between the defendants, be adjudged usurious and void and canceled; (2) that it be decreed that the defendant company (hereinafter called "Exploration Company") surrender 100,000 shares of stock of Ebner Gold Mining Company (hereinafter called "Ebner"), and 1,000 shares of stock of Humboldt Mining Company (hereinafter called "Humboldt"), to a receiver to be appointed for the benefit of plaintiffs and such others similarly situated as may come in; (3) that Exploration Company be enjoined from selling or offering to sell, or otherwise disposing of, these shares of stock; and (4) that the plaintiffs may have such other relief as may be in accordance with justice and equity.

Alaska-Ebner Gold Mines Company was a Maine corporation which owned the entire capital stock of Ebner and of Humboldt and 55 per cent. of the capital stock of Bristol Consolidated Mines & Smelting Company (hereinafter called "Bristol Company"), and these stocks constituted practically its only assets of any value. On December 19, 1912, the situation of the company was that receivers in equity had been appointed by the District Court of the United States for the Southern District of New York; that there were outstanding a large bond issue and current liabilities to a substantial amount in addition to those secured by collateral. On that day, a bondholders' protective and reorganization committee issued what is known as circular No. 1,

in which the committee set forth the history of the company, a brief description of properties in which it was interested, a general statement of securities outstanding and current liabilities, and various conclusions and recommendations of the committee. The circular stated that for several months negotiations had been carried on with representatives of the United States Smelting, Refining & Mining Company, with a view of interesting that company in the Alaska-Ebner enterprise. The company just mentioned is a different company from Exploration Company, but is substantially the same concern so far as affects the questions in this suit. Exploration Company is in the business, as its name implies, of investigating and exploring mines, and apparently the other company, among other things, takes up projects approved or recommended by Exploration Company. It was pointed out in this circular that the only security for the outstanding bonds consisted of (1) an abandoned copper mining property in California; (2) 55 per cent. of the stock of Bristol Company; (3) $159,600 par value out of a total of $500,000 par value of the stock of the Ebner. It was also stated that the water power of Ebner was of considerable value but liable to be lost by nonuser, and that a resumption of operations requiring the use of this water must take place within a reasonable time in order to retain the right to it.

The committee pointed out that to save the situation it was necessary (1) to secure the balance of the stock of Ebner of which the trustee then controlled only about 31 per cent.; (2) to secure certain shares of stock then held as collateral security for a loan to Alaska-Ebner; (3) to settle loans amounting to about $115,000 made by various parties to the Alaska-Ebner for which they held about $662,000 of bonds as collateral security; (4) to expend a sum not to exceed $200,000 in extending the tunnel on Ebner property and thoroughly exploring the ore deposits; (5) if ore deposits were found in quantity and of quality to warrant a large operation, to secure capital to develop the mines. The committee further stated that, in view of the complicated condition of the company's affairs and the uncertainty as to the possibilities of the future, it seemed impracticable to suggest a complete plan of reorganization at that time. It expressed the hope that a development company might be organized with Winslow and Rice of the Smelting Company controlling it, and stated that if a plan of organization could be prepared, to which the stockholders of the company would assent, money might be obtained to put the company on its feet, but, if not, then that it was apparent that the interests of the bondholders could only be protected by a foreclosure of the existing mortgage and the purchase of the property for account of the bondholders. The circular ended with the usual request for a deposit of bonds.

From the foregoing, it will be seen that this was, in substance, the customary form of address by a committee of bondholders, merely tentative in character and leaving the whole subject of future action in any definite way to future events and developments.

On June 28, 1913, an order was made by the District Court approving a contract between the receivers and one H. W. Martin, dated

May 27, 1913. That contract provided that Martin should proceed to do all such work upon the properties of Ebner and Humboldt as should be designated by the engineer of the receivers, with the approval of Martin, and that Martin should furnish all the materials and appliances necessary for that purpose; that Martin should not be required to expend any sum in excess of $200,000, should complete the work within 12 months; and that the receivers should issue their certificates in the requisite sums in an amount not to exceed $300,000, bearing interest at 6 per cent. and payable 18 months from the date of the first issue thereof, or upon any earlier date at the option of the receivers, and upon any sale pursuant to a decree of foreclosure of the property covered by the mortgage of the Alaska-Ebner. The contract further provided that the receivers were to deliver to Martin their certificates in various amounts mentioned, and for such further sums as had been advanced by Martin to purchase preferred or underlying claims against Alaska-Ebner and certain stock and securities, the amount of which advances aggregated $60,272.41 and interest, as well as certificates for the work, labor, and services to be performed by Martin. It was further provided that the receivers were to deliver and pledge to Martin, upon the surrender thereof, all of the preferred or underlying claims, stock, and securities of every kind, which he then held as security for his advances, and that these claims, stock, and securities were to be security for the receivers' certificates, pursuant to the order of court dated May 21, 1913.

It will be noted that the contract contemplated that Martin should not be required to expend more than $200,000, and that the receivers were authorized to issue their certificates in an amount not to exceed $300,000.

On June 30, 1913, as the result of negotiations between the committee now consisting of five members (hereinafter called the Chapman Committee) and the representatives of Exploration Company, an agreement was entered into between the Chapman Committee and Exploration Company. This agreement recited that Alaska-Ebner owned the entire capital stock of Ebner and Humboldt and 55 per cent. of the capital stock of Bristol Company, was without funds or credit to operate its controlled companies, had issued $1,615,000 par value of first mortgage 7 per cent. bonds, whereof about $843,000 were outstanding for value, and about $662,000 were treasury bonds pledged as collateral to loans aggregating, with interest, about $150,000, and that about $110,000 were in the treasury, all of which bonds were in default of principal and interest and were secured by the pledge of all the stocks and other assets of the company; that the value of the bonds depended chiefly on the value of Ebner, which value was unknown and could not be determined except by exploration and development work, estimated to require two years and $200,000 and, if value was proven, could not be extracted except by an expenditure of additional money estimated at upwards of $2,000,000; that the holders of the bonds were unable or unwilling to contribute sufficient money to improve the property or develop it; and that the Chapman Committee had on deposit with it upwards of 60 per cent. of bonds subject

to the right of the depositors to approve and enter into or reject and withdraw from any plan of reorganization the committee might submit. It was further recited that the committee solicited Exploration Company to undertake the exploration work upon terms proposed by the committee. Thereupon it was agreed as follows:

The committee was forthwith to submit to the depositing bondholders a plan of reorganization "pursuant to the terms hereof"; upon approval and acceptance of the plan by not less than 90 per cent. in amount of the $1,505,000 outstanding bonds, the agreement was to become effective and binding on the committee and on all of the consenting bonds. The plan of reorganization, in addition to providing for the $843,000 of bonds of Alaska-Ebner, was to include and provide for the taking over by the committee or in its behalf, the $150,-000 of loans collateraled by the $662,000 par value of bonds.

On the agreement becoming effective, the committee was to procure as quickly as may be, at the hands of the trustee of the mortgage, a foreclosure sale of the collateral, and at such sale was to purchase the collateral provided the cash required over and above the distributive share of the committee's bonds, available as pro tanto payment of the bid price, did not exceed $25,000, and this amount Exploration Company agreed to advance as well as such additional cash at its option as it saw fit. The committee, if it acquired the mortgaged property at foreclosure, was to hold and manage the same until the completion of exploration work, but not later than March 31, 1915, which date, or any earlier date at which the exploration work was completed, was to be the date of organization of a new company. Exploration Company, as soon as convenient after the agreement became effective, was to begin exploration work upon Ebner, and from time to time provide such amounts, up to $200,000, as in its uncontrolled discretion it deemed necessary to ascertain the ore body and values of the property, and Exploration Company was to be the sole judge of the extent to which the exploration should be carried and the manner in which it should be done, and could discontinue and abandon the work whenever, in its uncontrolled judgment and discretion, such abandonment was justified by the facts then existing. The committee was to procure to be executed, in such manner as to constitute a valid first lien upon the assets and property purchased by the committee at foreclosure and to deliver to Exploration Company, obligations so secured either of itself or of the subsidiary companies covering all advances made by Exploration Company to acquire underlying liens and claims and any other advances Exploration Company might make in connection with the agreement. Exploration Company, in the event its exploration showed, in its sole discretion and judgment, ore values available for operation on a large scale, was to so report to the Committee and to estimate the amount of money necessary for plan, equipment, development, and working capital. The committee on the judgment of Exploration Company was to transfer all of the property acquired by the committee at foreclosure to a new company to be organized by the committee for the purpose. This new company was to have an authorized capital stock of $7,500,000 and an author-

231 F.—14

ized issue of $4,000,000 first mortgage bonds, and the consideration from the new company to the committee for the committee's property so sold and transferred was to be $993,000 par value of the bonds and all of the capital stock of the new company. Certain other details were set forth which it is not necessary to repeat.

This agreement of June 30, 1913, was never made known to the depositing bondholders. No explanation appears in the testimony as to why this agreement was not made known. It is not suggested that either the Chapman Committee or Exploration Company had any fraudulent or improper purpose in not disclosing the contents of this agreement, and it may be that there was some good business reason for not so doing; but, whatever the reason is, it does not appear.

On June 30, 1913, there was no power whatever on the part of the Chapman Committee to make any binding contract, and the agreement recognized this situation; for one of the recitals shows that the deposit of bonds was subject to the right of the depositors to approve or reject the plan of reorganization, and it will be remembered that one of the provisions of the agreement was that the committee should submit to its depositing bondholders a plan of reorganization "pursuant to the terms hereof."

[2] Under date of September 11, 1913, a plan and agreement of reorganization (hereinafter called the "September Plan and Agreement") was put out by the Chapman Committee. A suit to foreclose the mortgage had been begun on or about April 2, 1913. The plan called attention to the fact that the mortgage was being foreclosed, and that it was the plan of the committee to purchase property at foreclosure sale, and then the plan stated:

"If such property is purchased by the committee it is proposed to organize a new company and to vest in it the ownership and control of all the property of the company which your committee may acquire at foreclosure sale or otherwise free and clear except for a prior lien of not exceeding $300,000 to be created by the committee and covering such cash as may have been expended to acquire underlying liens and for exploration work. The committee may in its absolute discretion defer the organization of the new company and the issue and distribution of the securities thereof until the completion of the exploration work now under way, and the necessary financing of the new company."

The distribution of the securities of the new company was substantially the same as that contemplated in the agreement of June 30, 1913. The agreement annexed to the plan had many provisions quite usual in such agreements, most of which it is unnecessary to set forth, but reference to some of which will be made later. The depositing bondholders thus had before them circular No. 1, the various court proceedings including the pending mortgage foreclosure and the Martin contract, and this plan of September 11, 1913.

It will be noted that the committee proposed the organization of a new company which was to own the property bought by the committee at foreclosure free and clear except for a prior lien of not exceeding $300,000. The word "prior" does not mean antecedent in time, but must receive the meaning familiar in papers of this character, namely, a first or superior lien. The sentence in question is susceptible of the interpretation that this $300,000 was to cover such

cash as, in the committee's opinion, it was likely would be expended by the time the new company was organized, in acquiring underlying liens and for exploration work, and that the new company, out of which the bondholders were to get possibly a good bond for a bad one, would not be incumbered beyond $300,000. Now, $300,000 was the amount mentioned in the Martin contract, and this may have been the gauge of the situation in the opinion of the Chapman Committee. On the other hand, an interesting computation may be made by taking the figures on defendant's Exhibit No. 4 of various amounts due down to September, 1913, and it will be found that the obligations with interest run roughly from $80,000 to $90,000. I could give the accurate figures, but I do not know whether the credits against Martin at the bottom of the page on defendant's Exhibit 4 were in 1913 or 1914.

It may be that the Chapman Committee estimated that the obligations for underlying liens and Martin's work would be $100,000 in round numbers, and as the estimate of Exploration Company under the contract of June 30, 1913, was that the exploration work would cost $200,000, the committee may have figured that the first lien would not exceed $300,000; but, whatever the basis of the estimate, the figure mentioned was "not to exceed $300,000."

It is immaterial whether the duty of the depositing bondholder ended with his reading of circular No. 1 and the September Plan and Agreement, or whether he is presumed, as matter of law, to have read the various papers on file in the District Court including, among others, the Martin contract. From none of these would he have gained an impression other than that it was the estimate and intention that the property would be incumbered to an extent of not to exceed $300,000. It would never have occurred to him that the Chapman Committee had abdicated all right of exercising its judgment and its visé over expenditures so as to confer upon Exploration Company the power to spend any money it deemed proper in its uncontrolled discretion and to further empower Exploration Company to act as the sole judge of the extent to which exploration should be carried and to authorize Exploration Company to discontinue and abandon exploration when, in the uncontrolled judgment and discretion of that company, such abandonment was justified by the facts then existing. In other words, this contract of June 30, 1913, stated colloquially, amounts to this:

"Gentlemen of the Exploration Company, explore to such an extent as you deem proper; stop when you please; we herewith estop ourselves from questioning either the amount of or necessity for your expenditures or your decision to continue or abandon. We pledge the property of the company which, in effect, is the property of the depositing bondholders, to you and if you stop exploration you may come down on us by foreclosing the pledge and we cannot and shall not have anything to say even though in our judgment you have spent too much money or you have stopped before you should."

Now, I am not to be understood as saying that this may not have been the only contract which the Chapman Committee could have made, nor that the Chapman Committee, in the circumstances, was not fortunate to get anybody to risk large sums of money on so speculative an enterprise. Likewise, I am not to be understood as saying that

Exploration Company did anything else than fair business judgment and caution would dictate. I do not regard the contract, as such, as in any manner open to criticism had it been between individuals or between Exploration Company and a committee having power to make such a contract. I recognize fully that such contracts are to be expected in a situation where the value of a mine is not known and where the speculator or intending investor feels that he should have the right, in his absolute judgment, to stop at a point where the further expenditure of his own money would be reckless waste.

But the point is that the depositing bondholders' were entitled to know that the Chapman Committee had made a contract of this character whereby, at the drop of the hammer, their property could be taken away from them.

Had the contract been known, the bondholders might very well have been satisfied upon the theory that that was the best that could be done in a bad situation, and that it was lucky for them that the Chapman Committee had obtained somebody who would put up any money for exploration.

On the other hand, the bondholders may have refused to enter into a plan and agreement which contemplated terms such as are contained in the agreement of June 30, 1913. Their refusal may have been unwise, and, as a result, they might have lost their property then and there. But that was their business because it was their property and, in such respect, a man may do what he pleases with his own property.

On December 30, 1913, a supplemental agreement was signed between the Chapman Committee and Exploration Company. It was recited that the consent of 90 per cent. of the bondholders had not been obtained, and the original contract was amended by striking out therefrom the second paragraph under article 7 and substituting another paragraph in place thereof to meet that situation. A clause was added as follows:

"2. The Exploration Company agrees that upon the foreclosure sale referred to in article 2 of the original agreement, if the committee shall be the successful bidder at such sale, the Exploration Company will make available to the committee for turning in as part of the purchase-price so to be paid by the committee for the property at foreclosure sale, all of the Exploration Company's claims for advances to the extent and in the amount to which and at which the same shall have been allowed by the court as a preferred claim payable out of the proceeds of sale before any distribution is made to bondholders, provided that such turning in shall not change or prejudice or in any manner whatsoever affect the respective rights and obligations of the Exploration Company and of the committee under articles 5 and 8 of the original contract, the intent hereof being that the Exploration Company's preferred claim for such advances may be used as between the Exploration Company and the committee in lieu of cash in payment of the purchase price at the foreclosure sale."

The contract of June 30, 1913, as modified, was declared effective or, in other words, confirmed.

Everything thereafter between the Chapman Committee and Exploration Company was done upon the theory that the contract of June 30th, as modified by the supplemental contract of December 30th, expressed and controlled the relations of the parties. The various

notices and communications on behalf of Exploration Company to the Chapman Committee and the conversations between representatives on both sides, extending the Chapman Committee's time, proceeded upon the theory that the contracts of June 30th and December 30th were in full force and effect, and this is evidenced, for instance, by the letter dated December 14, 1914, of Mr. Wing, of counsel for Exploration Company, to the Chapman Committee.

The foreclosure suit went to a decree on March 23, 1914, and the committee bought in as planned. Title was closed on May 21, 1914, before the special master, and $170,072.70 was required for the liens "a" to "k" set out in the foreclosure decree which, under that decree, were ahead of the bonds; $43,879.93 were required in cash for account of the committee to make good their bid; $16,753.69 was cash in the hands of the engineer on the property for current expenses of operation for which vouchers later came down. These items aggregated $230,706.32 for which the committee was obligated to Exploration Company. The committee, under date of May 21, 1914, made its note for this amount of $230,706.32 in the usual collateral note form and, among the collateral, were the shares of Ebner and Humboldt here in controversy. The due date of the note was November 20, 1914, which Mr. Wing testified was estimated as the time required to complete the exploration work.

The work of exploration continued, and, from time to time, the committee executed its notes, all due November 20, 1914, except notes made during December, 1914, and January and February, 1915, which were made payable on demand.

Under date of December 11, 1914, Mr. Jennings, the vice president of Exploration Company, addressed a communication to his board of directors, reporting on the results of exploration up to that time, and expressing as his opinion that there would not be found sufficient ore of enough value to warrant the formation of a company on the terms contemplated with the Chapman Committee. Mr. Jennings also wrote:

"In order, therefore, to justify the carrying out of this agreement, it would have been necessary to find ore in sufficient quantity, and value, to warrant a capitalization of $15,000,000. If such ore had been found, the rewards accruing to the Exploration Company would have been brilliant."

It was provided in paragraph 6 of the agreement of June 30, 1913, that Exploration Company, in the event its exploration showed, in its sole discretion and in its own judgment, ore values available for operation on "a large scale," would so report to the committee. Nothing was said as to $15,000,000, the point here being that this is another illustration of the complete abdication by the Chapman Committee whereby it was permitted to Exploration Company solely to determine, among other things, what they meant by "a large scale." The result of the Jennings' letter and the situation generally was that Exploration Company decided to stop and insisted upon payment of the committee's obligations.

By virtue of a clause in the collateral note of May 21, 1914, the collateral became subject to the later notes given from time to time as above mentioned.

On April 7, 1915, the collateral was offered for sale at public auction to satisfy a debt which had now accumulated to $408,921.13 and interest. A representative of one of the solicitors for plaintiffs warned intending buyers, in effect, that they would buy at their peril; but, of course, Exploration Company bought in the collateral and is now the purported owner of the stock in controversy.

The agreement of December 30, 1913, was without validity because of lack of power of the Chapman Committee to enter into it unless authority therefor can be found in the September Plan and Agreement.

Undoubtedly, the plan contemplated that the exploration work, then under way, could be completed; but, in the absence of a disclosure of the agreement of June 30, 1913, it must be assumed that the committee would exercise their discretion and judgment as to the amount to be expended for exploration work.

The Martin contract was subject to the supervision of the receivers, acting through their engineer, and no man, reading the September Plan and Agreement, could be expected to know or be presumed or assumed to know that, instead of exercising their discretion and judgment, the committee had divested itself of all discretion and judgment.

If the committee had exercised its discretion and judgment, then that exercise could not be questioned, in the absence of fraud or conduct so reckless as to negative that exercise.

The concluding clause of the plan provided that money and securities might be used by the committee "for such other purposes as the said committee in its uncontrolled discretion may determine." Here again, while a large measure of discretion is conferred upon the committee, as is usual in plans of this character, yet, nevertheless, it is a discretion which must be exercised, and that clause did not authorize the committee to strip itself of all discretion.

Throughout the agreement annexed to the September Plan, the reference is constantly to powers in connection with carrying out the plan and agreement, and the instrument must be read in the light of the familiar principle that the intent and meaning of a document must be gathered from its entire contents and having in mind the relation of any particular part to the relevant context. The power to pledge securities granted in paragraph 4 was in connection with carrying out the plan, and the power to borrow money, if for any other purpose, was for such purpose as "the committee may deem necessary," and the phrase "may deem necessary" indicates the exercise of judgment. The same observations may be made in respect of paragraph 7. In paragraph 9 is found the expression that the committee may borrow and use such sums of money upon such terms and subject to such conditions as in its discretion it may deem wise or necessary, to protect the interest of the depositors and for any of the purposes of this agreement.

In the first place, it is questionable whether this clause is applicable to the case at bar, because the transaction was not the ordinary transaction of lender and borrower; but, if it is, then again the clause, by its very terms, involves the exercise of discretion.

Finally, we come to the clause in paragraph 7 as follows:

"The committee may create such liens upon any or all of the property so acquired by it as may be necessary in the discretion of the committee to carry out the plan and this agreement or any part thereof or to protect or develop the said property or any part thereof or for any purpose the committee may deem wise or necessary."

The power so given to protect or develop the property, or for any purpose the committee may deem wise or necessary, is obviously subject to the limitation that such proper or necessary acts may be done as will protect or develop the property. So far as protection of the property is concerned, the reader of this clause would assume that money could be borrowed or otherwise obtained upon some arrangement whereby the property could be kept alive, the water power safeguarded, and the mines properly manned under some agreement which might, and likely would, involve a pledge to cover such sums of money as the committee in its judgment might, from time to time, consider were or should be properly expended. The same view must be taken of the expression "develop"; but it is clear beyond peradventure that this agreement, as a whole, and these clauses to which attention has been called, cannot be considered as notifying depositing bondholders, first, that an agreement had already been entered into (which would be effective if a certain per cent. of bondholders signed it), or that an agreement would thereafter be entered into, whereby the committee would place the property in the absolute power of Exploration or any other company, so that such a company could make unreasonable expenditures and stop upon the very eve of accomplishment, foreclose its liens, and possess itself of the property covered by those liens.

I do not suggest that such was done in this case, and Exploration Company has certainly expended a very large sum of money; but that has nothing whatever to do with the question of power affecting the agreements of June 30th and December 30th, in the light of the September Plan and Agreement.

The conclusion is inevitable that the agreement of December 30th, just as in the case of the agreement of June 30, 1913, was without power and must be declared void and set aside.

It follows that the sale of the collateral was likewise null and void.

The big note of $230,706.32 was valid to the extent of $213,952.63. These obligations the committee clearly had power to incur, and these figures are accurately fixed by the special master. Had the note been for this amount of $213,952.63, and this only, then the sale of collateral to satisfy that note would have been valid, and Exploration Company would now have title to the stock in controversy. But the sale was to satisfy a debt which included not only the balance of this note over $213,952.63, but also the other obligations, and there was no power or authority to sell the collateral to satisfy a debt greater than, at the time of the sale, had been actually fixed and then was actually due. For, of course, if the committee had no power to contract these debts and give these notes in accordance with the terms of the June 30th and December 30th agreements, whereby Exploration Company fixed the amount due, then the $408,921.13 and interest, the

debt claimed to be due at the time of the sale, was an unliquidated debt except to the amount of $213,952.63, and the sale was not confined to this last-named amount.

No title having passed to Exploration Company by this sale, the title remains in the committee for the benefit of the plaintiffs and others who may come in, subject to the lien of Exploration Company. So far as concerns the $213,952.63, the amount is fixed and the lien to that extent established.

As to the remainder, the committee, by virtue of the September Plan and Agreement, had power, irrespective of the agreements of June 30th and December 30th, to contract for the expenditure of such sums as might be necessary and proper to explore, protect, or/and develop the property, but that amount must now be determined, not by the unreviewable say-so of Exploration Company, but by the court. In other words, the amount due to Exploration Company over the $213,952.63 must be proved by Exploration Company like any other unliquidated claim, and, when proved, the plaintiffs will have such reasonable time as the circumstances may warrant in equity, to pay to Exploration Company the total amount due with such interest as may be allowable—failing which, the liened property will be sold in the manner and at a time prescribed by the court.

Finally, it is probable that the foregoing disposes of the contention that the agreements of June 30th and December 30th were usurious; but, in any event, construed as a whole, the agreements of June 30th and December 30th did not contemplate a loan nor the relation of debtor and creditor. The undertaking was speculative, involving a large risk. If successful, certain financial rewards were to follow; if unsuccessful, the money expended was to be repaid with simple interest. The transaction, as evidenced by the agreements, and the practical construction of the parties, was a venture, and not a mere borrowing and lending of money.

A decree will pass with the main features as follows: (1) Adjudging the agreements of June 30th and December 30th void; (2) adjudging the title of the stock in controversy to be the property of the committee in their representative capacity, subject to the lien of Exploration Company; (3) adjudging that the stocks are subject to a valid, existing lien of $213,952.63; (4) providing for the ascertainment by the court, or a master, of the additional amount due, for which amount Exploration Company will have a lien on the stocks; (5) restraining Exploration Company from selling or, in any manner, disposing of or pledging the stocks in question until further order of court, and requiring that they be placed in the custody of the court; (6) providing for a lien to such further amount as Exploration Company may expend subject to the order of this court, to protect the physical property while the provisions of the decree are being carried out; (7) dismissing the complaint against the individual defendants, because no relief has been asked of them and no proof adduced in this suit, warranting a decree against them; (8) providing for the further details indicated in the opinion. Settle decree on five days' notice.